OPINION OF THE COURT
Charles J. Markey, J.
The postverdict posture of this case raises an interesting issue, raised by the court sua sponte, of the proper payment to be made by New York’s Unified Court System (UCS) for the services of a sign language interpreter who worked unassisted or without the relief of another sign language interpreter. The is *310 sue raised is one of national first impression, since the court’s research has not found another federal or state case discussing it.
At the conclusion of this court’s prior opinion, Wahid v Long Is. R.R. Co. (15 Misc 3d 1120[A], 2007 NY Slip Op 50777[U], *6 [2007]), deciding several important pretrial issues, the court stated that it “commends [its Part Clerk] for . . . making the arrangements for a sign language interpreter for plaintiff Far-rah Wahid commencing from June 5, 2007 through the conclusion of this trial.” Although the court, by the foregoing quotation, thought of getting a sign language interpreter for the trial, it did not anticipate the related problems encountered in engaging one.
This personal injury case, commenced by plaintiff Farrah Wahid, who was an infant at the time of the accident, was tried from June 5 to 13, 2007. Farrah Wahid was and is deaf. A sign language interpreter, Mr. Gabriel Grayson, interpreted for Far-rah Wahid. For jury trials or for cases lasting two hours or more in duration, sign language interpreters often work in tandem in order to give one interpreter a respite while a colleague takes over.
Grayson actually worked on this trial of Wahid v Long Is. R.R. Co. on June 5, 6, 8, 11, 12, and 13, 2007. Grayson submitted four vouchers requesting double payment only for four days of this civil trial, for services rendered on June 8, 11, 12, and 13, in my Trial Term, Part 32, in the courthouse at Long Island City in Queens County, since Grayson, on June 5 and 6, also provided and was paid for services in a criminal case in another courthouse.
About a day before the trial, Grayson informed the senior court interpreter for Queens County, Ms. Cynthia Whiteman, that he would do the sign language interpretation only if he were permitted periodic rest periods. The prevailing custom is that American Sign Language (ASL) interpreters get relieved by a colleague after a stretch of time in light of the intensity of concentration and swift and tiring arm and hand movements. When Grayson made clear that he would not provide his signing skills unassisted, Whiteman sought another sign language interpreter to assist Grayson.
Whiteman kept her immediate supervisor current of the problem. With her supervisor’s consent, Whiteman contacted the Office of Court Interpreting Services (OCIS), a part of the Division of Court Operations of New York’s Office of Court *311 Administration (OCA), by both e-mail and telephone, about the problem. OCIS always assists in the search for interpreters whenever courts exhaust the resources at their disposal. An OCIS representative was unable to find another ASL interpreter to assist Grayson, and Whiteman so informed him. Grayson then proposed that he would work without relief if he were paid a double per diem rate. In response to Whiteman’s follow-up call, OCIS responded that the matter was entirely a budgetary decision over which the local court and its administration have discretionary authority. Whiteman, accordingly, then agreed to Grayson’s demand.
Toward the start of the trial, having been informed by Gray-son of the difficulties he encountered interpreting without a relief person and by Mark Finkelstein, the head clerk of the Long Island City courthouse, of Whiteman’s conversations with OCIS, I approved the arrangement. In order for this trial to proceed, I agreed that Grayson be paid double the per diem rate, where his services were being provided to the undersigned’s courtroom exclusively. After the trial, I signed an order, dated July 25, 2007, authorizing Grayson to recover “double the usual rate of pay for four days, to wit: June 8, June 11, June 12, and June 13, 2007, for providing said services without the customary assistance.”
This memorandum decision is intended to explain the court’s decision in signing the order and to throw a spotlight on the disturbing lack of skilled ASL interpreters in the courts.
Section 390 of the Judiciary Law, in pertinent part, states:
“Whenever any deaf person is a party to a legal proceeding of any nature, or a witness therein, the court in all instances shall appoint a qualified interpreter who is certified by a recognized national or New York state credentialing authority as approved by the chief administrator of the courts to interpret the proceeding to, and the testimony of, such deaf person; provided, however, where compliance with this section would cause unreasonable delay in court proceedings, the court shall be authorized to temporarily appoint an interpreter who is otherwise qualified to interpret the proceedings to, and the testimony of, such deaf person until a certified interpreter is available . . . The fee for all such interpreting services shall be a charge upon the state at rates of compensation established by rule of the chief administrator . . . .”
*312 Two ways exist to approach the issue of the appropriate payment to be made to Grayson. First, as a matter of contract law, an agreement was forged when I gave my consent to the double payment after Finkelstein alerted me to the problem and I talked with Grayson who explained his difficulties. Grayson made clear that he would not continue unless he were paid double or received relief by another sign language interpreter, and I then consented to the arrangement, having been advised of the arrangements with OCA. As a matter of simple contract law, the agreement must be respected.
Second, in terms of accommodation for persons with disabilities, the court sees many policy reasons why this agreement should be respected. Random House Reference has published an important and vital work recently, entitled Random House Webster’s American Sign Language Legal Dictionary (2003), written by Dr. Elaine Costello. Dr. Costello, in the introduction to this brilliant work, states:
“Except for the skilled intervention of a legal interpreter, most Deaf [litigants] would not ... be able to participate effectively .... [I]t remains the task of practiced interpreters, knowledgeable of the judicial system and legal concepts, to accurately communicate legal proceedings whether between the Deaf person and the arresting officer, the Deaf person and the attorney, or the Deaf person in the context of a courtroom hearing or trial.
“The task of using sign language in a legal setting is far more complex than in any other circumstance. The meanings of otherwise ordinary terms have unique meanings when used in the legal arena” (id. at iv).
In addition to the excellent Random House Webster’s American Sign Language Legal Dictionary, an insightful law review article by Michele LaVigne and McCay Vernon, An Interpreter Isn’t Enough: Deafness, Language, and Due Process (2003 Wis L Rev 843 [2003]), is a well-researched and eloquent addition to the little existing legal literature of the special needs facing deaf-mute persons.
Attorney Carla M. Mathers, Esq., who is licensed to practice in the federal and state courts of Maryland and the District of Columbia, is the author of an excellent resource book, entitled Sign Language Interpreters in Court: Understanding Best Practices (Authorhouse Pub. Apr. 2007 rev. ed.) (available at either *313 <www.carlamathers.net> or <www.authorhouse.com>). Mathers is a nationally prominent attorney who specializes in the rights of the deaf and the hearing impaired. She maintains an insightful blog for lawyers, interpreters, and deaf persons at <www.deaflawblog.com>. Mathers’s aforementioned book is the first comprehensive textbook examining the role and function of sign language interpreters in the legal arena.
In the present case, the court takes judicial notice that, at important functions, such as law school commencement exercises, the availability of relief sign language interpreters is customary because the physical endurance and mental stress of signing for a protracted period of time is huge. Whiteman’s inability to find another sign language interpreter to work with Grayson, even after contacting OCIS, speaks volumes of the lack of sign language interpreters available in the New York courts for on-site interpretation.
Securing an on-site ASL interpreter is indispensable when confronted by a party-litigant who is deaf. The interpreter, to do his or her job effectively, needs to be physically present in the courtroom in order to see who is talking, especially when an objection is made, and lawyers compete for attention by talking over each other. One of the reasons why the number of ASL interpreters available for on-site courtroom interpretation is dwindling may be directly attributable to the explosion of employment opportunities for ASL interpreters as video interpreters for video relay services (e-mail of Mr. Michael DeVito, principal management analyst and court interpreter administrator for New York’s Seventh Judicial District to Howard L. Wieder, Esq., the undersigned’s law secretary, dated Aug. 6, 2007; e-mail of Rosaline Hayes Crawford, Esq., director of the Law and Advocacy Center of the National Association of the Deaf [see, <www.nad.org>, and Mr. Wieder, dated Aug. 6, 2007]).
The shortage of ASL interpreters available in a legal setting, whether in a courtroom or in a lawyer’s office for an examination before trial, will be discussed in anticipated project reports sponsored by the Registry of Interpreters for the Deaf (RID) (<www.rid.org>). The RID-sponsored research is being conducted by the National Center on Deafness (NCOD) at California State University at Northridge and the National Consortium of Interpreter Education Centers (NCIEC) at Northeastern University. The NCOD study is focusing on institutions, and the NCIEC project report, which is being presented by Ms. Betsy Winston, project director, and Professor Dennis Cokely, associ *314 ate director, is focusing on practitioner needs (see, <www.asl.neu.edu/nciec/>) (S. Bartenstein, Research on Interpreter Supply and Demand, Views at 22 [June 2006], <www.rid .org>).
Although the NCOD and NCIEC research reports have not yet been issued, the Nebraska Commission for the Deaf and Hard of Hearing issued a report entitled Imbalance in Nebraska Courts (see, <http://www.ncdhh.ne.gov/legal_interp_factsheet.pdf>). It states that, since 2005, 65% of assignments requiring sign language interpreters in Nebraska’s legal system have gone unfilled.
In New York, Ms. Sandra Bryan, the UCS’s coordinator of court interpreting services (the coordinators of court interpreting services for each state can be found at <http://www. ncsconline.org/D_Research/CIConsortContactspage.html>), reports that, throughout New York State, “it has been a challenge to find and provide certified ASL interpreters to our court users for several reasons” (e-mail of Ms. Sandra Bryan to Mr. Wieder, dated July 31, 2007). According to Ms. Bryan, the problems impeding adequate staffing of ASL interpreters for on-site courtroom interpretation are several. First, regarding proper credentials, the UCS is required to provide interpreters who have a court interpreting certificate issued by RID. Interpreters have to wait sometimes many months in order to schedule their examinations with the organization. Candidates who fail the certification tests have to wait several months before being allowed to retake the exams (id.; accord, Bartenstein, supra at 23). Second, the applicant has to pay a considerable amount to take all of the required examinations, and, then, even after acquiring certification, the interpreter must regularly pay dues to RID or risk losing certification. If dues are not kept current, certification may be dropped, and RID is the only national certifying authority of ASL interpreters. Third, Ms. Bryan acknowledges that many certified ASL interpreters refuse to accept assignments based on the standard rate of $140 per half day and $250 for the full day offered by New York’s UCS. They complain that the rates are not competitive and that they can earn more and work in pairs automatically in the private sector. Fourth, certified ASL interpreters usually demand a cancellation fee — and, in a trial setting, sudden cancellations will inevitably occur as the chances of settlement dramatically increase the closer a case gets to a jury verdict. The UCS, however, as a matter of policy, will not pay cancellation fees (e-mail of Ms. Bryan to Mr. Wieder, supra). Finally, *315 many ASL legal interpreters choose to work for video relay services, which offer far better pay than the UCS and a working environment much less taxing than the mental and physical stress of listening to and interpreting several speakers in a deposition or trial setting.
Mr. Michael DeVito, a principal management analyst and court interpreter administrator for New York’s Seventh Judicial District, composed of Monroe County and seven other counties, states:
“[H]ere in Rochester we have the largest per capita deaf community in the nation. NTID (National Technical Institute for the Deaf) is located here in Rochester, as well as the Rochester School for the Deaf. However, despite the size of the community the number of qualified RID certified ASL interpreters is limited. I have verified that the video relay services has had an impact on the number of available interpreters because the companies that hire are offering full-time jobs with higher pay and benefits not otherwise met by voucher pay. Also, the work is less stressful. There is a reluctance to work in the courts due to the nature of the interpreting (legal terminology/stress/emotions).
“I would point out that our [seventh] judicial district, having faced these challenges for some time, has routinely requested and been granted permission to deviate from the standard per diem rates in order to pay the higher compensation requested by the local agencies. Our District Executive writes to the Administrative] Judge for Courts Outside New York City to request such approval. The rates requested reflect the customary compensation the local agencies require, which, I might add, does include a cancellation fee such as [Ms.] Sand[ra] Bryan points out is not paid as a matter of UCS policy.” (E-mail of Mr. DeVito to Mr. Wieder, supra.)
The shortage of available ASL interpreters has caused a flurry of legal proceedings. As more ASL interpreters seek better remuneration from video relay services, companies are trying to enforce restrictive covenants preventing video interpreters to be employed by a competing company (see, e.g., Petition for Declaratory Ruling and Complaint Concerning the Provision of Video Relay Service by Sorenson Communications, Inc. before the Federal Communications Commission [F.C.C.], CGB Docket 03- *316 123, May 18, 2007 [available at <http://flallfoss.fcc.gov/prod/ecfs/ retrieve. cgi?native_or_pdf=pdf&id_document= 6519412482>]). Exhibit 4 of Sorenson’s petition before the F.C.C. contains a letter from Mr. John S. Sanders, of Bond & Pecaro, to George L. Lyon, Jr., Esq., dated April 23, 2007, attributing the “growing shortage of ASL interpreters . . . [to] the implementation of stricter certification requirements, the advent of VRS [video relay services], and the need for ASL interpreters in educational institutions, government agencies, medical providers, and the like” {id., citing studies by Stax, Inc., Demand and Wage Trends for American Sign Language Interpreters, and Their Impact on the Deaf Community [Nov. 2006], and Midwest Center for Post-secondary Outreach, The Impact of VRS on Postsecondary Institutions [Oct. 2005]).
Another important fact is that the United States Department of Justice has entered the field enforcing the rights of the deaf in courts and lawyer suites around the country. Title III of the Americans with Disabilities Act (ADA) and its implementing regulation prohibit discrimination on the basis of disability by places of public accommodation (42 USC § 12182; 28 CFR 36.201). After securing other settlement agreements against state courts, the United States, as represented by lawyers from the Disability Rights Section of the Civil Rights Division of the Justice Department, on January 5, 2004, signed a settlement agreement with Gregg M. Tirone, Esq., a lawyer in Rochester, Monroe County, New York. Tirone represented a Kathleen Culhane Rozanski in her divorce. Rozanski is deaf. Tirone did not use a sign language interpreter in his meetings with his client, but communicated with her by other methods. He wrote notes, used the telephone relay system, and asked family members to communicate with his client. Although Tirone contended that he represented Rozanski competently and effectively, she filed a complaint with the Department of Justice in 2002, arguing that Tirone’s alternate methods of communication resulted in a higher legal fee. The settlement agreement between the Justice Department and Tirone, referring to the commentary to 28 CFR 36.303 that says “legal matters . . . require an interpreter for effective communication” (28 CFR part 36, Appendix B, subpart C), concluded: “Attorneys are considered a public accommodation and must provide sign language interpreters when necessary to provide effective communication, which is the case when the client uses sign language as his or her primary means *317 of communication’ ’ (Settlement Agreement Between United States of America and Gregg Tirone, Esq., Department of Justice Complaint Number 202-53-20,1f 11, <http://www.ada.gov/ tirone.htm> [a public document under paragraph 26]). Probably as a result of Tirone’s experiences, the Foundation of the Monroe County Bar Association (of New York State) announced a grant to benefit the greater Rochester deaf and hard-of-hearing community. The Philadelphia Bar Association also initiated a program that creates a sign language interpreter fund. The purpose of these laudable programs by these two bar associations is to help attorneys communicate with their deaf clients by permitting them to apply to the fund for a sign language interpreter.
Although not directly on point regarding the legal issue of the appropriate rate of pay to ASL interpreters for on-site courtroom interpretation, two cases are helpful. In Monterastelli v Lebanon Community School Dist. (2001 WL 9861, 2001 US Dist LEXIS 40 [D Or 2001]), the court denied the summary judgment motion by the defendant school district that sought to dismiss the workers’ compensation claim of a sign language interpreter who claimed trauma to her right shoulder as a result of overuse during sign language interpretation. In Houston Community Coll. Sys. v Schneider (67 SW3d 241 [Tex Ct App Hous 1st Dist 2000], review denied [Mar. 21, 2002]), a sign language interpreter for deaf students in the appellant college was permitted to keep her workers’ compensation benefits. She complained that she had developed carpal tunnel syndrome as a result of her signing work.
Although this court’s research has not found any other case, state or federal, directly addressing the legal issue of the proper payment for a sign language interpreter or whether two interpreters must be provided for the same trial, the injuries sustained by the claimants in Monterastelli and Houston Community Coll. Sys. are instructive. The two cases demonstrate that ASL interpreters suffer physical stress as a result of rapid-fire interpretation by hand and arm movements. Those two cases, in fact, occurred in educational settings. A fortiori, in a volatile and intense courtroom setting, where attorneys pose numerous questions and are quick to burst to objections, the demands upon an ASL on-site interpreter are immense.
Nothing in this court’s opinion should be interpreted as mandating that the ADA requires either (1) double payment in every case employing a single language interpreter, or (2) the *318 employment of two sign language interpreters working in tandem. Yet, under the special circumstances of this case, and considering the respect that the New York courts have for both the rights of persons who are handicapped, sensory impaired, or unfamiliar with English and the public policy that they be given equal access to the courts, this court, sua sponte, approves the agreement and authorizes double payment to Grayson for the days indicated.
Gordon Hewart (1870-1943), in a memorable dictum in Rex v Sussex Justices ex parte McCarthy (1 KB 256 [1924]), stated: “A long line of cases shows that it is not merely of some importance, but it is of fundamental importance, that justice should not only be done, but should manifestly and undoubtedly be seen to be done” (id. at 259, quoted in Robert Jackson, The Chief: The Biography of Gordon Hewart, Lord Chief Justice of England 1922-40, at 161-162 [George G. Harrap & Co. 1959]). With increasing societal awareness and sensitivity to the plight of deaf persons in the courts, we can add to Hewart’s famous dictum that justice, in the form of courtroom proceedings, must also be clearly heard and, for the hearing deprived, must be unmistakably interpreted so as to be undeniably understood.
In the present case, the jury, in the liability phase of this long trial, found for the defendants that they were not negligent. The plaintiff Farr ah Wahid will need to live with that verdict, unless overturned on appeal, and, for her, resolution of the case required an understanding of the testimony and court conferences conveyed by effective sign language interpretation of the courtroom proceedings by a certified interpreter. Grayson’s effective sign language interpretation made sure that Wahid understood, and, considering the mental and physical energy that he alone expended, without relief by another interpreter, the double per diem payment is neither unreasonable nor excessive.
The notion of an enhanced pay rate for interpreters, moreover, is not foreign to the court system. Other Supreme Court justices in this county have issued orders authorizing higher pay rates for interpreters who understand and can interpret the Asian languages of Malayalam and Fuzhou (also known as Fuchow) (see, e.g., People v Xadi Fen, Sept. 25, 2002, Kron, J., indictment No. 3497/2000 [increasing the per diem compensation “due to the scarcity of Fu Chow interpreters”]; People v Kong Wong, Feb. 2, 1999, Erlbaum, J., indictment No. N10147-96 [same]).
*319 In light of the shortage of ASL interpreters and the prevailing custom to have sign language interpreters work in tandem because of the arm and hand fatigue in signing, Grayson’s request for approval of the four vouchers seeking a double per diem rate was not unreasonable.
This court, accordingly, issued an order on July 25, 2007 authorizing that Gabriel Grayson be paid double the normal payment per diem rate for the ASL interpretation services provided by him on June 8, 11, 12, and 13, 2007. The court, furthermore, extends its appreciation to Mr. Grayson, Ms. Whiteman, and Mr. Finkelstein, whose dedication to their work helped facilitate the trial of this action.
Since the court, sua sponte, raised the issue presented in this memorandum decision, governing an internal matter of a proper pay rate for an interpreter, the views of trial counsel were not solicited.